## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **ASHWIN RAMASWAMI,**<br><br>　　　**Plaintiff,**<br><br>**v.**<br><br>**SHAWN MICAH TRESHER STILL, an individual, and LANDMARK COMMUNICATIONS, INC.,**<br><br>　　　**Defendants.** | **Case No.**<br><br>**JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Ashwin Ramaswami files this Complaint against Shawn Still and Landmark Communications, Inc.

1.    This is an action seeking presumed, actual, and punitive damages against Still and Landmark for their outrageous, false, and malicious publication of defamatory statements about Ashwin, statements published with the express purpose and effect of placing Ashwin in a false light, causing injury to him, and damaging his reputation.

## <u>PARTIES, JURISDICTION, AND VENUE</u>

2.    Shawn Still is a citizen of the State of Georgia and resides in Johns Creek, Fulton County, Georgia.

1

3.      Landmark Communications, Inc. is incorporated in the State of Georgia and has its principal place of business in Alpharetta, Fulton County, Georgia.

4.      Ashwin is a resident of the State of California.

5.      Because the parties are citizens of different states and the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000, this Court has subject matter jurisdiction under 28 U.S.C. § 1332.

6.      This Court has personal jurisdiction over the Defendants, and venue lies in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b), because Still resides in Fulton County, the offices of the Landmark are in Fulton County, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## **FACTS**

7.      Ashwin is a Georgia native and a young leader from the community with a background in law and technology, entrepreneurship, and public service. His parents settled in the Atlanta suburbs after immigrating to the United States from India.

8.      He was born in Johns Creek, Georgia, the heart of Senate District 48, and he lived in that same family home continuously from birth in 1999 until he left for college in 2017.

9.    He attended Ocee Elementary, Taylor Road Middle School, Fulton Science Academy Charter School, and Chattahoochee High School.

10.    At Chattahoochee High School, he led the Quiz Bowl team to four consecutive Georgia state championships. He also organized high school and middle school tournaments with teams across the state. He founded Chattahoochee's first Modern Physics Club and first Science Bowl team, which went on to win back-to-back Georgia state titles and finish fifth nationally at a competition in Washington, D.C.

11.    During his senior year, Ashwin dual-enrolled full-time at Georgia Tech, graduated second in his high school class in May 2017, and delivered the salutatorian's commencement address to his graduating class. He spoke of the true meaning of success and the value of giving back to the community.

12.    Ashwin matriculated to Stanford University in August 2017, but retained his Georgia domicile and came home during every academic recess.

13.    When COVID-19 shuttered the Stanford campus in March 2020, Ashwin moved out of his dorm back to Johns Creek and completed his computer-science degree from home.

14.    During the summer of 2020, Ashwin accepted a post at the Cybersecurity and Infrastructure Security Agency, where he helped protect nationwide election infrastructure during the 2020 cycle, including in Georgia, and remained on staff through 2023.

15.    In August 2021, Ashwin began a juris doctor program at Georgetown University Law Center in Washington, D.C.

16.    In the summer of 2023, he worked in the Office of Georgia Attorney General Chris Carr on cases involving protecting children on social media platforms.

17.    Throughout this period, he voted in Georgia elections, filed Georgia tax returns, and continued to mentor students at his former schools.

18.    In late 2023, Ashwin decided to give back to his community by running for office, challenging incumbent state senator Shawn Still in Georgia's Senate District 48.

19.    Ashwin formally announced his candidacy on December 2, 2023, filing his declaration of intent to accept campaign contributions with the Georgia Campaign Finance Commission.

20.    He immediately resumed full-time residence in Johns Creek, but commuted weekly to Washington, D.C., to finish his last semester at Georgetown Law while canvassing during the rest of the week in Senate District 48.

21.    After receiving his J.D. in May 2024, he began campaigning full-time in Johns Creek and was certified unopposed in the May 21, 2024 Democratic primary.

22.    From that point forward, all campaign operations – including payroll, vendor payments, and volunteer coordination – were run out of his Johns Creek headquarters.

23.    At age 25, Ashwin was seeking to become the first Gen Z member of the Georgia Senate.

24.    He explicitly championed having legislation written with rather than for young people.

25.    Ashwin centered his campaign on fully funding Georgia's public-school system, raising teacher pay, and expanding mental-health resources for students.

26.    He promised increased per-pupil spending, smaller class sizes, increased salaries to boost teacher retention, and state-backed dual-enrollment scholarships to widen college access.

27.    Ashwin pushed for school-based mental health counselors and stress-reduction programs, citing the high-pressure experience typical of many students in North Fulton, North Gwinnett, and South Forsyth County's competitive schools.

28.    Ashwin also advocated for commonsense gun-safety measures, like safe-storage requirements, universal background checks, and red-flag orders, to keep schools safe.

29.     He also emphasized gun-violence prevention—especially given the September 2024 Apalachee High School shooting—expanded civic-education curricula, and greater involvement from young people on legislation affecting their lives.

30.     According to the Georgia Government Transparency & Campaign Finance Commission, Ashwin's campaign raised nearly $1 million. The amount Ashwin raised more than doubled that raised by Still and set a fundraising record for the district.

31.     Ashwin's campaign maintained an active roster of roughly two hundred volunteers who performed such activities as canvassing, phone-banking, data entry, and event staffing.

32.     Around two dozen high-school students helped with outreach and campaign activities, as well.

33.     Some high school students independently started a "Students for Ashwin" organization that designed graphics, managed social media content, and registered classmates to vote.

34.     Parents frequently canvassed alongside their teenagers, turning otherwise typical weekends into family civic-engagement outings.

35.     Many students who volunteered for Ashwin's campaign documented their hours to claim credit toward high school volunteer hour requirements.

6

36.     Using the Georgia Democratic Party's voter file, Ashwin's campaign knocked on tens of thousands of doors, sent more than 100,000 texts, and executed regular phone-banks.

37.     The Georgia Democratic Party's voter file includes vote history, contact details, and modeling scores for every registered voter in District 48. However, if a high schooler had recently turned 18, they would not be in the voter file.

38.     The campaign regularly held town halls, meet and greets, and fundraisers in the district.

39.     The campaign also layered a paid-media buy across cable, streaming, radio, and digital platforms to supplement direct voter contact.

40.     Ashwin accepted invitations to speak at various community events and with different groups, including high schoolers. This included gun safety groups organized and led by high schoolers; advocacy groups at North Gwinnett High School; and classes and organizations at his alma mater, Chattahoochee High School.

41.     And Ashwin relied on earned media to connect with voters. In addition to national and state outlets, several high school newspapers interviewed Ashwin. For example, there were profiles of Ashwin by Lambert High School students in *The Lambert Post*, by Chattahoochee High School

students in *The Speculator*, and by South Forsyth High School students in *The Bird Feed*.

42.   Because Ashwin was seeking to become the first Gen Z member of the Georgia State Senate, and was appealing to young voters through his policy proposals, in January 2024, Ashwin submitted a lawful Open Records Act request to the Open Records Office at the Fulton County School System.

43.   The request – dated January 20, 2024 – asked for a list of students currently attending the three local high schools in Johns Creek: Chattahoochee High School, Johns Creek High School, and Northview High School.

44.   Ashwin timed the request so that any information received could inform spring 2024 voter-registration drives ahead of a May 21, 2024 primary.

45.   The purpose of the Open Records Act request was to identify 17- and 18-year-olds eligible to vote and to ensure that they understood absentee and early voting and registration rules and to encourage students to become civically engaged through the electoral process.

46.   Having a directory of names would better inform the campaign's volunteer recruitment and voter registration efforts, for example by allowing the campaign to identify which schools young voters in the voter file attended

or helping existing student volunteers understand how many people in their
class year had not yet registered to vote.

47.    The campaign wanted to do as much as it could to ensure that
young people were civically engaged equally across every public high school
in the district.

48.    An Open Records Act request can only return public records, so
Ashwin knew there was no harm in making such a request to see which
public records were available to enhance the campaign's understanding of the
district and voter contract programs.

49.    The Fulton County School System denied the request and
produced no records. Ashwin did not challenge the denial of the request.

50.    Ashwin's campaign also used Discord, a social media
communications platform initially popular with video game players but now
used by a variety of professional, educational, and civic organizations. Having
a campaign presence on Discord was equivalent to a campaign having a
Facebook, Instagram, and LinkedIn page.

51.    The messages the campaign posted on Discord were public and
people could comment and respond to them.

52.    The campaign encouraged students on its Discord page to
complete a Google form to "capture their information and be able to tap them
as volunteers and remind them to vote when the time comes."

9

53.    The campaign also spoke of trying to gather information about college students since Ashwin was trying to appeal to young voters.

54.    The campaign also discussed on Discord its effort to have voter registration drives at schools.

55.    One public post by a volunteer for Ashwin's campaign stated: "For non partisan voter registration (no mention of Democrats or Republicans, no mention of Ashwin or Fake elector Shawn Still), the principal should not be needed. One of the vice principals can likely okay it. If you find out who signed off on prior voter registration drives, the same person can do the same for you, I suspect."

56.    Indeed, the messages on the campaign's Discord page were about civic engagement through registering, voting, and volunteering.

57.    The campaign, however, never ultimately conducted any such voter registration drives in schools and did not collect any information through its Google form.

### STILL AND LANDMARK PUBLISH FALSE STATEMENTS ABOUT ASHWIN

58.    Still knew that Ashwin had not violated any laws in submitting his Open Records Act request.

59.    Landmark knew that Ashwin had not violated any laws in submitting his Open Records Act request.

60.    Nevertheless, Still and Landmark worked together to publish false statements about Ashwin.

61.    In or around early September 2024, Still and Landmark published the following flyer:





62.    On or around September 19, 2024, Still and Landmark directed that this flyer ("Flyer #1) be mailed to households in Senate District 48.

63.    In or around mid-September 2024, Still and Landmark published the following flyer:





64.    On or around September 28, 2024, Still and Landmark directed that this flyer ("Flyer #2") be mailed to households in Senate District 48.

65.    The return-address postmarks on both of the flyers state "US POSTAGE PAID LANDMARK."

66.    Still used Landmark to publish his other campaign materials.

67.     The flyers do not identify who paid for them. Under Georgia law, if an independent or leadership committee pays for a campaign flyer, the flyer itself must identify the committee who paid for it. No similar requirement applies to campaign flyers paid for by candidates themselves.

68.     That the flyers do not identify who paid for them demonstrates that they were not paid for by an independent or leadership committee, but instead by Still.

69.     Further, Still was asked why he was sending the flyers and responded that it was because Ashwin was attacking him so much that Ashwin deserves it.

70.     Additionally, Still alluded to the information contained in the flyers in a conversation with one of his neighbors well before the flyers were sent by Landmark.

71.     Still persistently refused to disavow the flyers.

72.     In fact, on or around September 30, 2024, Still stated on WSB radio that, "we were noticing some disturbing trends coming out of my opponent's camp, and it started with a request that was made back in January to solicit the name, number, address, email of every student in all of the North Fulton high schools."

73.     According to public campaign finance disclosures, Still paid Landmark a total of $96,570.48 for "Other Mailers": $43,840 on September

23, 2024; $44,242 on October 16, 2024; $6,620 on October 17, 2024; and $1,868.48 on November 4, 2024. Constituents across the district, including individuals from Johns Creek, Sugar Hill, Suwanee, and Cumming, reported receiving the flyers. Given the total cost Still spent on "Other Mailers" with Landmark, it is likely that 120,000 to 140,000 flyers were sent out in total.

74.    Additionally, on or before October 9, 2024, a text message from the Still campaign sent to registered voters in the district included the same image of a child receiving a call from Ashwin as appeared on Flyer #1, further demonstrating Still's connection to the flyers.

75.    Thus, Still and Landmark published the flyers.

### THE PUBLISHED STATEMENTS ARE FALSE, DEFAMATORY, AND OUTRAGEOUSLY PRESENT ASHWIN AS SOMEONE HE IS NOT

76.    Flyer #1 contains at least five false statements of fact, specifically:

a.    Ashwin "was caught soliciting children in local schools," which is repeated on each side of the flyer.

b.    Ashwin "tried to solicit students in North Fulton and Forsyth Schools."

c.    Ashwin made "an open records request, asking for the names and numbers of all students enrolled in high schools."

      d.     On "private social media" the campaign sought to "bypass principals in schools."

      e.     The image of a young child receiving a call from Ashwin deliberately implies that Ashwin was calling young children to solicit sex.

77.    The phrase "soliciting children" is a factual assertion.

78.    Whether someone is attempting to solicit sex from school-aged children is not a matter of opinion, but of verifiable fact or falsity.

79.    Soliciting children for sex is a felony.

80.    The statements that Ashwin was "caught soliciting children in local schools" and "tried to solicit students in North Fulton and Forsyth Schools" are false in numerous ways. First, no one "caught" Ashwin doing anything. He made a publicly available open records request in his own name. Second, the open records request did not in any way solicit children. Third, the common usage and understanding of "soliciting children" is seeking to have sex with children, which Ashwin was not attempting.

81.    The statement that Ashwin made "an open records request, asking for the names and numbers of all students enrolled in high schools" is false because the request did not seek any student contact information. The false aspect of this statement is intentionally designed to lend itself to the "gist and sting" that Ashwin was attempting to solicit children for sex.

17

82.    The statement that on the campaign sought to "bypass principals in schools" on "private social media" is false because the campaign was not trying to "bypass principals in schools" and the language on the flyer was designed to lend itself to the "gist and sting" that Ashwin was attempting to solicit children for sex by engaging in conduct that he did not want the school to know about and to act without a school's approval. As part of the design to create that "gist and sting," the flyer included the false statement that Ashwin was posting such comments through "private social media" messages. In truth, the comment in question was on a public Discord channel.

83.    And the phrase "bypass principals in schools" is false because it intentionally implies that Ashwin was seeking to engage with students outside the protections that schools would offer and was acting nefariously to pursue sex with children. In truth, the very comment cited for the idea that Ashwin was seeking to bypass "principals in schools" refers to the fact that school vice principals "can likely okay" the voter registration drives so that the "principal should not be needed" and indicated that a student could go to the same school official who signed off on prior voter registration drives.

84.    Finally, the child shown holding the phone in the image on the flyer also falsely implies that Ashwin was caught calling young children to solicit them for sex. The child in the image is younger than a high schooler,

creating a stronger impression that the purpose behind Ashwin calling could not be related to campaign matters.

85.     Therefore, the average reasonable recipient or reader of Flyer #1 understood the "gist and sting" of the flyer, considered in its entirety, as communicating a fact that Ashwin was caught attempting to solicit sex from school-aged children.

86.     Flyer #2 contains at least three false statements of fact, specifically:

      a.     Ashwin is "soliciting children in your area," which is repeated on each side of the flyer.

      b.     Ashwin's Open Records Act request was "seeking the names and phone numbers of 5,493 underage children."

      c.     Ashwin demanded "direct access to your children's contact information."

87.     The five false statements in Flyer #1 and the three false statements in Flyer #2 will be collectively referred to as "the Statements."

88.     As discussed above, the phrase "soliciting children" facially presents as a factual assertion and soliciting children for sex is a felony.

89.     The statements that Ashwin was "soliciting children in your area" is false. The open records request which is the basis for the factual assertion did not in any way solicit children. And the common usage and

19

understanding of "soliciting children" is seeking to have sex with children, which Ashwin was not attempting.

90.    The statement that Ashwin's request sought the "names and phone numbers of 5,493 underage children" is false because the request did not seek any student contact information. And the use of the language "underage children" is intentionally designed to lend itself to the "gist and sting" that Ashwin was attempting to solicit children for sex because "underage" indicates under the age of being able to have consensual sexual relationships.

91.    The statement that Ashwin's Open Records Act request amounted to "demands for direct access to your children's contact information" is false because Ashwin did not demand any information – it was a request for public records – and did not seek contact information.

92.    The image on Flyer #2 is designed to look like a wanted poster warning citizens of an accused pedophile. It is intentionally concocted to leave the impression that Ashwin has been charged as a child predator.

93.    Therefore, the average reasonable recipient or reader of Flyer #2 understood the "gist and sting" of the flyer, considered in its entirety, as communicating a fact that Ashwin had been caught attempting to solicit sex from school-aged children.

94.    The common usage of the words and images used by Still and

Landmark conveyed factual statements that Ashwin was seeking to solicit sex with underage children.

95.    There is nothing figurative or hyperbolic about the phrase "soliciting children."

96.    The phrase "soliciting children" presents as a factual assertion that is verifiable as true or false.

97.    The phrase "soliciting children" is an accusation of specific criminal wrongdoing.

98.    The phrase "soliciting children" appears alongside other asserted facts – including an image of the records request – lending it an additional air of factuality.

99.    The statements are premised on a false statement of fact that Ashwin requested the contact information of students.

100.    The image of Ashwin calling a young child also presents a factual assertion that Ashwin was calling young children.

101.    In addition, the statements intentionally present Ashwin as someone who is soliciting children for sex.

102.    The depiction of Ashwin as someone soliciting children for sex is false.

103.    Being falsely depicted as someone soliciting children for sex would be highly offensive to a reasonable person.

### THE STATEMENTS ARE NOT SUBJECT TO ANY LEGAL PRIVILEGE

104. Still made the Statements with ill will toward Ashwin and with the intent to injure him.

105. Still repeatedly made comments and took actions during the course of the campaign that demonstrated his ill will for Ashwin.

106. Still posted on Ashwin's LinkedIn page that "You shouldn't be allowed in any public school with minors."

107. Still posted on Ashwin's LinkedIn page that "you needs [sic] to stay away from our kids."

108. Still posted on Ashwin's LinkedIn page that "By the way, how was the bar exam? I noticed your name absent from the pass list that was just published." Ashwin did not take the bar exam during the campaign, so he could not have passed it.

109. Still expressed to a neighbor extreme anger that someone in his neighborhood would hold an event for Ashwin and indicated to that individual that a report would soon be coming out about Ashwin's purported "criminal conduct."

110. In July 2024, Still created a website using Ashwin's name as the domain name (www.ashwinramaswami.com), that contained negative information about Ashwin.

111. In September 2024, Still stated that Ashwin's conduct "flies in

the face of Hinduism, flies in the face of Christianity, of Judaism, of any religion known in the world."

112.   The timing of the events provides further evidence of Still's intent to harm Ashwin. Ashwin made the Open Records Act request in January 2024. By his own account, Still knew about the request at that time. Still waited until September 2024 to raise the matter. Waiting for so long to raise the matter demonstrates Still's purpose: to harm Ashwin, not to discuss a matter of public importance.

113.   By failing to include any notation on the flyers as to who paid for them, Still and Landmark sought to increase the likelihood of harming Ashwin's reputation because recipients would not know that they were campaign advertisements.

114.   These statements and actions, along with others throughout the campaign, demonstrated Still's ill will toward Ashwin.

115.   Landmark, acting at Still's behest and on his behalf, harbored the same ill will toward Ashwin.

116.   The statements contained in Flyer #1 and Flyer #2 were designed by Still and Landmark to injure Ashwin.

117.   As such, the statements in the flyers are not subject to any conditional privilege.

118.   On July 14, 2025, Ashwin sent a formal, written retraction

demand to Still and Landmark.  Neither Still nor Landmark published a
retraction.

STILL AND LANDMARK ACTED WITH ACTUAL MALICE

119.   Still and Landmark knew that the Statements and the
impressions they left were false.

120.   Still knew that Ashwin had not been attempting to solicit
children for sex.

121.   Landmark knew that Ashwin had not been attempting to solicit
children for sex.

122.    Prior to publishing the Statements, Still had in his possession
the Open Records Act request that showed Ashwin had not requested high
school students' contact information.

123.   Thus, Still knew that Ashwin had not requested high school
students' contact information, but nevertheless published statements that
Ashwin had sought students' contact information.

124.   Prior to publishing the Statements, Landmark had in its
possession the Open Records Act request that showed Ashwin had not
requested high school students' contact information.

125.   Thus, Landmark knew that Ashwin had not requested high
school students' contact information, but nevertheless published statements
that Ashwin had sought students' contact information.

24

126.   Still had in his possession the publicly available Discord message and therefore knew that Ashwin had not sought to "bypass principals" in an attempt to get student contact information, but nevertheless published statements indicating that Ashwin had sought to bypass principals to gain access to students' contact information.

127.   Landmark had in its possession the publicly available Discord message and therefore knew that Ashwin had not sought to "bypass principals" in an attempt to get student contact information, but nevertheless published statements indicating that Ashwin had sought to bypass principals to gain access to students' contact information.

128.   Even after being presented with the actual Open Records Act request in public interviews, Still continued to falsely state that Ashwin was soliciting children and sought their contact information.

129.   Still regularly cited an "investigative report, done by a retired Cobb county police captain" to support his allegations. Although Still himself commissioned and paid for the report, he published it on the www.ashwinramaswami.com website as if it were a credible, objective, independent report authored by law enforcement.  Thus, Still used "sources" that were not credible to support and amplify his false statements about Ashwin.

130.   Similarly, Still cited "other groups" to support his assertions,

25

referring to ads by Peach State Values, a political action committee designed to support Still's campaign. Here, again, Still knew these other "sources" were not accurate or independent but nevertheless used them to amplify his false statements about Ashwin.

131.   Still and Landmark knew that Ashwin, a candidate for public office, would not use an Open Records Act request to public schools as a means of soliciting children for sex.

132.   Still's and Landmark's statements about Ashwin also contained internal inconsistencies. For example, Flyer #1 stated that Ashwin had in private social media messages sought to bypass school principals. But Ashwin's Discord channel and posts were public. In addition, the message talked about going to vice principals as an option. Further, the flyers each stated that Ashwin had sought contact information, when the very Open Records Act request that Still and Landmark relied on showed that Ashwin had not sought contact information of students.

133.   Still and Landmark also failed and refused to retract the flyers even after public reports repeated what Still and Landmark knew already, that is, that the Statements were false.

134.   These facts demonstrate that Still and Landmark made the Statements knowing they were false, and chose the language on the flyers for the express purpose of conveying a false impression that Ashwin had engaged

26

in criminal solicitation of children.

### STILL'S AND LANDMARK'S PUBLISHED STATEMENTS HAVE CAUSED ASHWIN DAMAGE

135.   The Statements are defamatory per se because they impute to Ashwin a crime punishable by law, specifically soliciting a child for sex, which is a felony in Georgia pursuant to O.C.G.A. § 16-6-5. In addition, the crime of soliciting a child for sex results in the perpetrator being defined as a "sex offender." *See* O.C.G.A. § 42-1-12(a)(9)(B)(iv).

136.   In addition, the Statements are defamatory per se because they charge Ashwin with being guilty of a debasing act which may exclude him from society.

137.   Because the Statements are defamatory per se, damage is inferred.

138.   In addition, the publication of the Statements caused Ashwin substantial actual damage.

139.   The images, content, and message from the flyers were reposted by individuals on social media, including Facebook, Instagram, and X.

140.   After Still and Landmark published the flyers, Ashwin received comments relating to the flyers and death threats:

      a.      September 22, 2024: "Shut your bitch ass up pedo. You look like you're about 12 years old. Is that why you wanted the phone

numbers of addresses to high school students?"

      b.      September 22, 2024: "You are a pervert. Stay away from my kids."

      c.      September 22, 2024: "Pedo fuck."

      d.      September 22, 2024: "Asshole."

      e.      September 22, 2024: "Ashwin is a pervert."

      f.      September 22, 2024: "You're gross."

      g.      September 22, 2024: "Stop your drama creep."

      h.      September 22, 2024: "Are u a pedophile? Why did u ask underage teen info for?"

      i.      September 30, 2024: "Why does he want access to children's info. Pervert."

      j.      September 30, 2024: "Quit trying to get kids [sic] information you creep."

      k.      October 1, 2024: "I was going to vote for [Ashwin] but can you let me know why he was requesting Fulton County School Board to release students [sic] name and home addresses?"

      l.      October 13, 2024: "I'm gonna kill you and your family"

      m.      October 17, 2024: "Creeper."

      n.      October 17, 2024: "Pedophille [sic]."

      o.      October 17, 2024: "Ashwin is a pedo."

p.   October 17, 2024: "I don't support ANYONE who solicits teenagers [sic] phone numbers. He's a Pedophile."

q.   October 17, 2024: "I thought Ramashwami [sic] liked kids?"

r.   October 31, 2024: "I'll fucking kill you."

141.   Polling completed in support of the campaign confirmed the reputational harm done to Ashwin by the flyers. When asked what they recall "seeing, hearing, or reading lately about Ashwin Ramaswami," some of the answers respondents offered included:

a.   "Creepy trying to get kids' school info"

b.   "Obtaining minor kids' personal data"

c.   "Requested enrollment records from local high schools"

d.   "Collected info from schools"

e.   "Requesting HS students' names/addresses"

f.   "That he tried to get the information of a bunch of high school students"

g.   "Asking for kid info"

h.   "I heard he attempted to get records regarding underage students from Fulton County Schools"

i.   "High school solicitation"

j.   "He's a creep asking for children's info at public schools"

k.   "His opponent called him a pedophile"

l.    "Pedophile"

m.    "Approaching minors"

n.    "He is creepily approaching young kids"

o.    "Predator"

p.    "That he's a pedophile"

q.    "He is a pedophile that wants rampant crime"

r.    "Soliciting students"

s.    "Abuse children"

142.    Ashwin took the death threats and comments seriously and contacted local police, when appropriate.

143.    The threats and label as a pedophile caused Ashwin significant distress.

144.    In addition, Ashwin expended resources on legal fees to assess the legality of the flyers.

145.    Several donors became reluctant to contribute to Ashwin's campaign after the flyers, including an organization that chose not to follow through with a significant investment into the campaign.

146.    The emotional and psychological effects of the false statements, threats, and attacks cannot be overstated. Due to the threats he received and the reputational harm, Ashwin decided it was safer to leave Georgia after the

election.

## COUNT ONE – DEFAMATION PER SE

147.   Ashwin repeats and re-alleges Paragraphs 1-146 as if set forth fully herein.

148.   Still and Landmark published the defamatory statements identified above, including all statements made about Ashwin on the dates identified, by authorizing and sending the flyers, and by affirming, endorsing, repeating, and agreeing with the statements in them; and by republishing the statements in later interviews and events and on Still's website, social media accounts, and other digital platforms.

149.   Still and Landmark published the false and defamatory statements of and concerning Ashwin with actual malice—with knowledge of falsity or reckless disregard for truth or falsity.

150.   Still's and Landmark's statements are reasonably understood to be statements of fact about Ashwin, and were understood by people who saw, heard, and read them to be statements of fact about Ashwin.  The gist and sting of the statements made by Still and Landmark of and concerning Ashwin considered individually and in their entirety, was that Ashwin sought to gain through his Open Records Act request students' contact information so that he could solicit them for sex.

151.   Still's and Landmark's statements about Ashwin are false.

152.   Still and Landmark had no applicable privilege or legal authorization to make the false and defamatory statements, or if they did, they abused it.

153.   Still's and Landmark's defamatory statements, whether taken individually or together in their cumulative impact, damaged Ashwin in the various ways described above.

154.   Ashwin is entitled to punitive damages because Still's and Landmark's defamatory statements were accompanied with malice, wantonness, and a conscious desire to cause injury. Still and Landmark purposefully made the defamatory statements heedlessly and with reckless and willful indifference to Ashwin's rights.

155.   Still and Landmark had a specific intent to harm Ashwin.

156.   Ashwin is entitled to punitive damages because Still and Landmark published the defamatory statements about Ashwin with actual malice.

157.   Still's and Landmark's statements are defamatory *per se*, as they impute to Ashwin a crime punishable by law and charge him with being guilty of a debasing act. Still's and Landmark's statements have exposed Ashwin to the most extreme hatred and contempt. Still's and Landmark's statements were calculated to—and did in fact—provoke outrage and cause Ashwin significant harm.

32

158.   Still's and Landmark's lies about Ashwin reached tens of thousands of people and caused enormous harm to Ashwin. As a result of the defamatory campaign, Ashwin has suffered the single and indivisible injuries discussed previously. Ashwin has suffered presumed and actual damages, through internal emotional anguish and distress, and through external harm to his reputation.

159.   The lies Still and Landmark published about Ashwin were specific and verifiably false, and therefore not "opinion."

160.   In sum, as explained above, Still and Landmark made these false statements about Ashwin with actual malice. Still and Landmark knew these statements were false.

161.   In view of the foregoing, Ashwin is entitled to special, actual, presumed, punitive, and other economic damages in an amount to be determined at trial.

## COUNT TWO – FALSE LIGHT

162.   Ashwin repeats and re-alleges Paragraphs 1-161 as if set forth fully herein.

163.   The actions and statements by Still and Landmark described above have placed Ashwin before the public in a false light.

164.   The statements by Still and Landmark about Ashwin would lead the public to believe that Ashwin was a pedophile and/or child predator

seeking to solicit children for sex.

165.   Still's and Landmark's published statements about Ashwin involve a significant misrepresentation of Ashwin's character, history, activities, and beliefs.

166.   Still's and Landmark's published statements about Ashwin would be highly offensive to a reasonable person.

167.   The offensiveness of the false light is demonstrated, in part, by the scorn and ridicule accompanying the statements from Still by Still himself, as well as from those who received the flyers.

168.   As explained above, Still and Landmark had knowledge of the falsity of their assertions about Ashwin. At a minimum, Still and Landmark acted in reckless disregard as to the falsity of its assertions about Ashwin.

169.   Still's and Landmark's portrayal of Ashwin has caused Ashwin significant damages.  As a result of the false statements, Ashwin has suffered the single and indivisible injuries discussed previously.

170.   Ashwin is entitled to punitive damages because Still's and Landmark's false light statements were accompanied with malice, wantonness, and a conscious desire to cause injury. Still and Landmark purposefully made the statements heedlessly and with reckless and willful indifference to Ashwin's rights.

171.   Still and Landmark had a specific intent to harm Ashwin.

172.   Ashwin is entitled to punitive damages because Still and Landmark published their false light statements about Ashwin with actual malice.

173.   In view of the foregoing, Ashwin is entitled to actual, presumed, and other economic damages in an amount to be determined at trial.

## COUNT THREE – PUNITIVE DAMAGES

174.   Ashwin repeats and re-alleges Paragraphs 1-173 as if set forth fully herein.

175.   Still's and Landmark's actions showed willful misconduct, actual malice, oppression, and that entire want of care which raises the presumption of conscious indifference to the consequences.

176.   Still and Landmark acted with the specific intent to cause harm.

177.   Ashwin is accordingly entitled to punitive damages to punish, penalize, or deter Still and Landmark in an amount to be determined at trial, without limitation.

## COUNT FOUR – EXPENSES OF LITIGATION

178.   Ashwin repeats and re-alleges Paragraphs 1-177 as if set forth fully herein.

179.   Still and Landmark have acted in bad faith by engaging in intentional wrongdoing and acting with a reckless disregard of known harmful consequences of their actions.

180.    Ashwin is accordingly entitled to an award of expenses of litigation, including reasonable attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

## **PRAYER FOR RELIEF**

WHEREFORE, Ashwin Ramaswami respectfully requests that the Court enter an award and judgment in his favor, and against Shawn Still and Landmark Communications, Inc., as follows:

(a)    general damages, actual damages, and compensatory damages in an amount to be determined at trial, in excess of $75,000;

(b)    punitive damages in an amount to be determined at trial;

(c)    expenses of litigation, including reasonable attorneys' fees;

(d)     pre- and post-judgment interest; and,

(e)    such other and further relief as the Court deems appropriate.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: August 8, 2025                          Respectfully submitted,

Of counsel:                                    */s/ Bruce P. Brown*
                                               Bruce P. Brown
Michael J. Teter                               Ga. Bar No. 064460
TETER LEGAL                                    BRUCE P. BROWN LAW LLC
P.O. Box 522365                                1123 Zonolite Road, Suite 6
Salt Lake City, UT 84152                       Atlanta, GA 30306
Tel: (385) 262-3650                            (404) 386-6856
michael@teterlegal.com                         bbrown@brucepbrownlaw.com

36